**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | |
| *ex rel* **KGB, INC., an Illinois corporation,** | ) | |
| **and MICHAEL J. BOZAN, as relators** | ) | |
| **and in their own capacities,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 07 C 5481** |
| | ) | |
| **KRISTINA BREED-GAMBINO, NICHOLAS** | ) | |
| **JOVANES, JOVANES ENTERPRISES, INC.,** | ) | |
| **JOVANES ASSET MANAGEMENT** | ) | |
| **CORPORATION, GLOW TAN, INC.,** | ) | |
| **KGI, INC., and CINDY JOVANES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Michael Bozan has sued Nicholas Jovanes, Cindi Jovanes, and Jovanes Asset
Management, along with other defendants. Bozan asserts five claims against the
Jovanes defendants. Counts 4 and 5 are state law claims against Nicholas Jovanes
and (as to Count 4) Jovanes Asset Management for rescission and conspiracy to
defraud. Counts 9 and 10 are claims against Nicholas Jovanes under the Racketeer
Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962© & (d). Count 12
is a claim against Cindi Jovanes for unjust enrichment. The Jovanes defendants have
moved for summary judgment on all claims. For the reasons set forth below, the Court
denies their motion.

**Facts**

On a motion for summary judgment, the Court draws "all reasonable inferences from undisputed facts in favor of the nonmoving party and [views] the disputed evidence in the light most favorable to the nonmoving party." *Harney v. Speedway Super-America, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

Bozan, a Chicago police officer, met Kristina Breed-Gambino (Gambino) in late 2004 or early 2005 through an interpersonal web site. Gambino told Bozan that she owned a tanning salon in Buffalo Grove called Tan Express. In the following months, Bozan told Gambino that he had been thinking about buying a business and that he would finance it with the equity in a home he owned in Las Vegas and the condominium in which he lived in Chicago.

In the early spring of 2005, Gambino phoned Bozan to find out whether he would be interested in opening a tanning salon with her, because she had plans to expand and create a chain of salons in Chicago. Bozan expressed interest, and in early April 2005, they discussed the tanning business. Gambino showed Bozan a manual on the "Trinity" tanning machine, which she said cost $20,000 per machine. Gambino mentioned her friendship with the machine's manufacturer, Nicholas Jovanes, and said she was using the same machines at Tan Express, which made her about $250,000 per year. Gambino suggested Bozan use the equity in his properties to cover the cost of the machines, she would cover the salon's build-out and start-up costs, and they could get a Small Business Administration (SBA) loan to cover remaining costs.

In mid-April 2005, Bozan visited Tan Express and Gambino explained the operation of the salon. Gambino said she was working with Jovanes on her expansion plans because he was knowledgeable about the industry and a prior owner of salons. At Gambino's insistence, Bozan called Jovanes, who confirmed that he was working with Gambino to establish a chain of tanning salons. He said that Tan Express's success proved that their concept worked. The salon featured Jovanes' Trinity tanning machines, which were stand-up models and had several advantages over other machines, which Jovanes detailed. These included the fact that the machines were "high pressure" machines, which would tan customers quicker than traditional tanning machines, allowing the salon to operate more efficiently.

Bozan told Jovanes he was looking for a business to own, and Jovanes stated that the opportunity Gambino offered was better than anything he could find on his own. Jovanes explained that in his and Gambino's experience, a salon could easily make $350,000 to $400,000 per year within the first year or two. The salons they planned to establish would engage in group advertising and group buying to build a reputation and reduce costs. Because the opportunity to establish a major chain of tanning salons in the Chicago area might pass, he and Gambino needed investors who could finance the new salons.

During this and other conversations, Bozan says, Jovanes repeatedly represented that Gambino owned the Tan Express salon, referring to the business as "Kristina's salon" and "her Tan Express." Jovanes also repeated and emphasized the advantages of his Trinity tanning machines.

After his initial conversation with Jovanes, Bozan met with Gambino at Tan Express once or twice more. Gambino showed him the monthly sales records on her computer, which reflected $7,000 to $8,000 per month in auto-drafts under membership contracts, not including daily sales of tanning services and lotions. After one year, Gambino claimed, she had grossed $350,000 to $400,000 and kept $250,000 in profits.

Bozan continued discussing the possible business relationship with Gambino by phone in April and May. On June 10, 2005, Gambino and Bozan met James Stolt, a Comerica Bank loan officer, to discuss the possibility of an SBA-guaranteed loan. Gambino represented that she was the owner and operator of the Tan Express salon. Bozan then learned that Stolt was already aware of Gambino's experience and plans to expand because, in addition to opening a salon with him, Gambino was opening a salon with her grandfather in Naperville under the corporate name KGI, Inc. Based on her experience with Tan Express, Gambino informed Stolt that she expected her proposed salons to cost $600,000 each.

Stolt expressed interest in financing the salon but said there were several preconditions to a loan. Comerica and the SBA would require Bozan and Gambino to make a cash investment in the business amounting to thirty percent of the cost of establishing the business. Comerica would verify the investment before disbursing the funds. Comerica also expected Gambino and Bozan to personally guarantee the loan and secure it with business and personal assets. In addition to the salon's business assets, Comerica would require mortgages on Bozan's home in Las Vegas and his condominium in Chicago. Bozan said that he was concerned about staking what he

owned on the tanning salon's success and that he was not ready to make a commitment. Stolt and Gambino said that if Bozan decided to proceed, they would make all the arrangements for processing the loan.

After the meeting, Gambino called Bozan a couple of times to ask if he had made up his mind about the loan. Bozan continued to express concern about risking what he owned on the salon. Gambino suggested Bozan meet Jovanes and inspect the tanning machines' manufacturing facilities. Bozan agreed, and Gambino arranged the meeting. In mid-June 2005, Bozan met Jovanes and Gambino at his manufacturing facilities in Glen Ellyn and Niles, Illinois. At the Niles facility, Bozan observed at least sixty assembled tanning machines. Jovanes said that some of them had been set aside for Gambino and that he was giving her a volume discount. Jovanes told Bozan that if he invested with Gambino, he would benefit from the same discount. Jovanes continued to represent that he would provide "high pressure" tanning machines.

At the Niles plant, Jovanes stated that he and Gambino had learned from experience that the tanning business had seasonal cycles but that over time the peaks were higher and the dips were not as low. Jovanes illustrated these cycles in graph form on a sheet of paper. Jovanes said that Bozan would be able to leave the police department within two years and that after opening his first salon, Bozan would want to do as Gambino was doing and open a second salon with the cash flow from the first. In that way, Bozan could leverage his investment to a string of tanning salons with a cash flow of $1,000,000 per year.

When Bozan asked Jovanes about the cost of building out the salons, he replied that it varied but could range between $40,000 to $160,000. Jovanes also encouraged Bozan to take out the Comerica loan. In response to concerns Bozan expressed about pledging everything he owned to the bank, Jovanes said, "Loans are a fact of life," and "That's how business is done." Jovanes assured Bozan that if anything went wrong, he would be able to cover the loan by selling the tanning machines, because he would be buying them at a discount, and their actual value was greater than the amount of the loan.

Jovanes told Bozan that the new salon would fail only if Bozan did not follow his and Gambino's directions. He assured Bozan that he and Gambino had already gone through the process of building a tanning business, making mistakes, and learning from them. Jovanes also said that he expected Bozan to be loyal to them and did not want Bozan to open any salons independently or to buy anyone else's machines, because this would harm the network they planned to create.

By the end of the meeting, Bozan had agreed to move forward with the investment. He agreed to take out a home equity loan on his property in Las Vegas to pay for the deposit on the tanning machines, and he told Gambino to arrange the loan with Comerica.

In mid-July 2005, Bozan obtained from LaSalle Bank a home equity loan on his Las Vegas property. Gambino asked to have the cashier's check drawn to the order of Glow Tan, Inc. and delivered to her, telling Bozan that this was the corporate name she was using for her salons. She promised to deliver the money to Jovanes as a deposit

6

on the tanning machines. Bozan obtained a cashier's check for $181,729.66 and delivered it to Gambino on July 18, 2005.

On August 26, 2005, Bozan met with Gambino to sign Comerica's formal loan proposal letter. Attached to the letter was a checklist of items Comerica needed to move forward with the loan, including evidence of capital injection in the business. Gambino stated she would deliver these items to the bank. Also in August 2005, the loan for Gambino's Naperville salon closed, with a $372,000 disbursement to Jovanes Asset Management.

When Bozan could not reach Gambino in September 2005, he contacted Jovanes to find out what he had heard from her. Jovanes said the Comerica loan was on track and that Gambino was busy setting up her salon in Naperville. Gambino called Bozan shortly after his conversation with Jovanes. Gambino reported that the Comerica loan was progressing but that she could not reach agreement on a lease with the landlord of the North Aurora location they wanted for the salon.

In October 2005, Gambino and Bozan met and he signed the formal SBA loan application for KGB, Inc., the corporation Gambino formed for their salon. Bozan says that later that same month he learned, to his surprise, that Gambino had entered into a lease for a salon in Romeoville, contrary to their plan to open up shop at a location in North Aurora. Gambino said she was unable to get a satisfactory lease at the North Aurora location and that Jovanes had picked a new location.

In late November 2006, the SBA authorized Comerica's loan. Before authorizing disbursement of the loan proceeds, Comerica required a cash injection into KGB, Inc.

of $194,700. Bozan was required to personally guarantee the loan. Gambino submitted documents to Comerica to prove investment in the business and improvements to the premises in Romeoville. Bozan provided confirmation to Stolt that he had invested $191,700 in the project. The loan closed on December 2, 2005, and $390,000 of the proceeds were disbursed to Jovanes Asset Management.

In late January 2006, Bozan learned that Gambino had not made the first payment to Comerica and that the loan was in default. On February 8, 2006, Gambino admitted that she had not made the payment and that she did not have money to make the payment. She asked Bozan to make the payment to avoid a default. When Bozan asked about the loan proceeds, Gambino said she had reimbursed herself for the down payment on the tanning machines and spent the rest on the salon's build-out. Bozan asked to see receipts for the work on the salon, but Gambino said she had given all the documentation to the bank. By the end of their meeting, Bozan agreed to ask his mother for money, because he had none to contribute. When Bozan asked to see the salon, Gambino said she could not give him the key because her key was the master key to all of her salons. A day or two later, Bozan called Gambino to say that his mother had agreed to lend him money, but she wanted to see the salon first. Gambino agreed to give the key to Jovanes so he could show the store to Bozan and his mother.

Bozan, his mother, and sister met Jovanes at the salon in February 2006. Although Gambino and Jovanes had informed him that the salon was ready to open, the salon was nowhere near ready. Jovanes, aware that Bozan's mother was interested in contributing funds, reiterated to them much of what he had told Bozan

about the potential of the salon. Jovanes allegedly claimed that if Bozan opened the salon, he would be able to repay his mother within a year. During their meeting, Bozan says, he learned for the first time that Jovanes, not Gambino, owned the Tan Express in Buffalo Grove.

The record includes documents reflecting that Jovanes created Jovanes Enterprises in 2003 and built out its primary asset, the Tan Express salon, in 2004. Jovanes and Gambino agree that he sold Jovanes Enterprises and Tan Express to Gambino in 2004. Jovanes claims that he sold the entity and its assets to Gambino through a purchase agreement that provided for installment payments and that stated Jovanes would run the company and keep its profits until Gambino paid in full. Jovanes contends that Gambino still owes him $150,000 but that despite the arrearage, she took over the company sometime after September 2006. Gambino denies the existence of the purchase agreement and the installment contract.

In April 2006, Bozan filed suit against Gambino in state court, seeking control of KGB, Inc. He hoped to get control of the corporation and save his investment. Comerica agreed to forebear action for a reasonable period of time while Bozan pursued his lawsuit, but it hired a liquidator, Don Dodge, to inspect the salon and the tanning machines.

In June 2006, Bozan decided to try to find someone else to go into business with him or buy the machines. He first asked Jovanes, who declined. Bozan then called Don Hirsch, who owned a string of tanning salons, and talked to him about purchasing the salon or the machines. Hirsch was familiar with the Trinity tanning machine

9

because Jovanes' nephew, Rick Hoffman, had tried to sell him the same machine. Hirsch told Bozan that the machines were not "high pressure" machines and that Bozan had paid too much for them.

In late June 2006, Jovanes told Bozan that he heard Bozan was "bad mouthing" him and his company. Bozan denied making derogatory statements but said he learned Jovanes had not supplied the salon with high pressure machines. Jovanes allegedly denied telling Bozan the machines were high pressure machines but said they were capable of being converted to high pressure machines.

By the end of June 2006, Bozan had abandoned efforts to open the salon or resell the machines. Dodge took possession of the tanning machines for Comerica and later informed Bozan that he learned that Jovanes' other customers did not pay as much as Bozan had for the machines. Dodge conducted an auction of the machines for Comerica in September 2006, and Jovanes bought them back for $100,000. Bozan later learned that KGI, Inc. also defaulted on its loan and that Jovanes repurchased that entity's tanning machines at its auction for $100,000.

By the fall of 2006, Bozan found it difficult to meet his obligations on the loan from LaSalle Bank. In April 2007, he sold the Las Vegas home for $455,000. Comerica received the proceeds that remained after the first and second mortgages were paid off, which amounted to $30,000. In June 2007, Comerica sued Bozan on his guaranty of the unpaid note and obtained a judgment for $449,769.24.

Gambino subsequently opened a tanning salon in Romeoville with two other people, financing the purchase through a loan from Banco Popular. Gambino stated to

the couple and the bank that she owned the Tan Express salon in Buffalo Grove.  In April 2007, Jovanes sold tanning machines to that salon.  The salon is now closed, and Gambino's co-owners are faced with bankruptcy.  The salon's machines were sold at an auction, and Jovanes repurchased the machines.

## Discussion

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56©.  To determine whether a genuine issue of material fact exists, the Court must view the record in the light most favorable to the nonmoving party and draw reasonable inferences in that party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002).  A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

## A.    Civil conspiracy

Civil conspiracy in Illinois consists of "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act."  *Fritz v. Johnston*, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004).  This requires more than "[a]ccidental, inadvertent, or negligent participation in a common scheme . . . ."  *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133-34, 720 N.E.2d 242, 258 (1999).  The

plaintiff must prove that the defendant "knowingly and voluntarily participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 64, 645 N.E.2d 888, 894 (1994). "A defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do [his] part to further those objectives, however, is liable as a conspirator." *Id.* at 64, 645 N.E.2d at 894; *see also McClure*, 188 Ill. 2d at 134, 720 N.E.2d at 258. "[A] conspirator need not participate actively in or benefit from the wrongful action in order to be found liable." *Adcock*, 164 Ill. 2d at 65, 645 N.E.2d at 895 (citing *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983)). Indeed, all members of a conspiracy "are liable for injuries caused by any unlawful acts performed pursuant to and in furtherance of the conspiracy," regardless of whether the conspirator planned or knew about the wrongful act. *Id.* at 64, 645 N.E.2d at 895.

Because it is difficult to obtain direct proof, conspiracy is generally established "from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances." *Id.* at 66, 645 N.E.2d at 895; *see also United States v. Wantuch*, 525 F.3d 505, 519 (7th Cir. 2008) (a jury may find an agreement to conspire "based on circumstantial evidence and reasonable inferences drawn from the relationship of the parties, their overt acts, and the totality of their conduct."). Under Illinois law, to prove conspiracy from circumstantial evidence, "that evidence must be clear and convincing." *McClure*, 188 Ill. 2d at 134, 720 N.E.2d at 258.

### 1. Evidence of an agreement

An agreement is defined as "an understanding - explicit or implicit - among co-conspirators to work together to commit the offense." *Wantuch*, 525 F.3d at 519 (quotation marks omitted). Jovanes contends that there is no proof of an agreement between conspirators, because the evidence presented is as consistent with innocent conduct as with guilt. He also contends that he cannot be liable for civil conspiracy because the evidence establishes only that he innocently acted in a way that fortuitously furthered Gambino's tortious purpose.

Jovanes is correct that under Illinois law, "if the facts and circumstances relied upon are as consistent with innocent conduct as with guilt, it is the duty of the court to find that the conspiracy has not been proved." *Bimba Mfg. Co. v. Starz Cylinder Co.*, 119 Ill. App. 2d 251, 267, 256 N.E.2d 357, 365 (1970); *see also Tribune Co. v. Thompson*, 342 Ill. 503, 529, 174 N.E. 561, 571-72 (1930); *McClure,* 188 Ill. 2d at 140-41, 147, 720 N.E.2d at 261-62.

Illinois courts have applied this test to reject conspiracy claims in cases in which the evidence failed to show a meaningful connection among the alleged co-conspirators. *See Bimba Mfg.*, 119 Ill. App. 2d at 267-69, 256 N.E.2d at 365-66 (evidence showing "curious coincidences" insufficient to establish a conspiracy); *Bergeson v. Mullinix*, 399 Ill. 470, 475, 78 N.E.2d 297, 300 (1948) (evidence of separate acts of the alleged conspirators insufficient to establish a conspiracy because it showed no "connection or confederation" between them); *Tribune Co.*, 342 Ill. at 532, 174 N.E. at 572 (no conspiracy where, "but for the[ ] alleged [newspaper] notices or

warnings [, defendants,] would have known nothing of the alleged conspiracy and unlawful diversion of funds.").  Illinois courts have also applied this test to cases in which the only evidence of conspiracy presented was parallel conduct by alleged co-conspirators.  *McClure*, 188 Ill. 2d at 146, 720 N.E.2d at 264 (evidence of parallel conduct, where alleged co-conspirators knew asbestos could cause disease, sold products containing asbestos, and failed to warn or protect employees from asbestos dust, insufficient to establish conspiracy); *Redelman v. Claire Sprayway, Inc.*, 375 Ill. App. 3d 912, 925-26, 874 N.E.2d 230, 242-43 (2007) (same).  The standard is less clearly applicable in this case, however, because there is a good deal of evidence that the alleged co-conspirators, Gambino and Jovanes, worked together and acted in concert, not just in a parallel fashion.  The Court also notes that at the summary judgment stage, federal law requires a court to draw reasonable inferences against the party seeking summary judgment, not in that party's favor.

Jovanes contends that he did nothing more than innocently engage in three legitimate business transactions with Gambino and/or Bozan that may have happened to further Gambino's tortious purpose.  The first two involved selling Gambino and Bozan merchandise for their new tanning salon; the third consisted of Jovanes' receipt from Gambino of a $100,000 check from Glow Tan Inc.  Jovanes claims that the check was tendered in payment of Gambino's purchase of the Tan Express salon in Buffalo Grove.  Because these transactions can be explained in an innocent way, Jovanes contends, there is no evidence from which a jury reasonably could find that he participated in a conspiracy.  This argument runs contrary to the principle that "[i]t is not

the legality of [the] actions that are in question, but the underlying means [by] which these actions were carried out." *Dempsey v. Sternik*, 147 Ill. App. 3d 571, 576, 498 N.E.2d 310, 313 (1986). Though Jovanes' participation in these transactions may not be enough by itself to prove his participation in a conspiracy, there is other circumstantial evidence from which a reasonable fact finder could conclude that he and Gambino conspired to defraud Bozan.[1]

The evidence reflects that Jovanes and Gambino had a very close business relationship that did not simply involve purchases and sales of goods and services. Rather, there is evidence that Jovanes played an active role in securing Bozan's investment in Gambino's tanning salon. Gambino testified that Jovanes wanted to talk to Bozan about getting the home equity loan and the Comerica SBA loan. Gambino 10/27/2008 Dep. 327-28. Bozan states that Jovanes encouraged him to take out the loans and go into business with Gambino and that Jovanes represented that he and Gambino were experienced in the business and that Bozan would succeed only if he did exactly as they said. Bozan Aff. ¶ 26. There is evidence that Jovanes served on several occasions as an intermediary between Gambino and Bozan and that he selected the Romeoville location of Gambino and Bozan's tanning salon. *Id*. ¶¶ 32, 36,

---

[1] Jovanes cites no authority for his contention that, like the defendants in *Tribune Co.*, he is entitled to the presumption that he acted in good faith and with honest motives. In fact, the court in *Tribune Co.* specifically noted that the presumption applied because appellants were public officials and the conspiracy charged involved government corruption. *Tribune Co.*, 342 Ill. at 529, 174 N.E. at 572. One wonders whether the Illinois Supreme Court would apply the same principle today. In any event, because Jovanes is not a public official, the purported presumption does not apply.

40, 43.  This evidence suggests that Jovanes worked together with Gambino to secure Bozan's investment in a common enterprise.

Jovanes argues that any representations he made that the tanning machines were "high pressure" have no bearing on his participation in a conspiracy.  A reasonable jury could infer, however, that Jovanes was desperate to unload his tanning machines after another deal evidently fell through and that he worked, together with Gambino, to secure new purchasers (including Bozan).  This evidence is relevant, at a minimum, to show intent and motive on Jovanes' part.

In sum, there is evidence from which a jury reasonably could infer an agreement between Jovanes and Gambino to secure Bozan's investment by whatever means were necessary, including fraud.

**2.      Underlying tort**

Jovanes also argues that Bozan cannot prove an underlying tort, as required to support his claim of civil conspiracy.  In Illinois, a claim of fraudulent misrepresentation, the underlying tort argued by Bozan, requires the plaintiff to "establish the following elements: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance."  *Doe v. Dilling*, 228 Ill. 2d 324, 342-43, 888 N.E.2d 24, 35-36 (2008).

Jovanes contends that Bozan cannot claim he is a victim of fraud because, among other things, he received the tanning units and equipment he wanted, paid the

price he expected to pay, successfully secured the loans for which he applied, was aware of the risks involved, and there was no misrepresentation concerning Gambino's ownership of the Buffalo Grove salon.

Gambino and Jovanes allegedly misrepresented to Bozan and Comerica that Gambino owned Tan Express.[2]  Bozan maintains that even if Gambino purchased Tan Express, Jovanes' representations concerning Gambino's experience were fraudulent because, in fact, she was still learning the business.  Eric Aylor, underwriter at Comerica, testified that Gambino's purported experience as a "hands-on manager" was a significant strength in her application.  Aylor Dep. 48-49.  Gambino and Jovanes made statements to Bozan and Comerica about Gambino's experience.  If those statements were false and believed to be false, a fact finder could reasonably conclude that their intent was to induce Bozan to invest in Gambino's business and induce Comerica to approve the loan.

Jovanes contends that representations he made to Bozan about his tanning machines were true because they have the same output as high pressure tanning units.  There is evidence, however, that the term "high pressure tanning machine" refers to a specific type of tanning unit and that Jovanes' machines were not high pressure machines.  Hirsch Dep. 30-31.  This arguably misled Bozan to compare the cost of Jovanes' machines with that of real high pressure machines, when they arguably were

---

[2] Jovanes seems to suggest that it was unreasonable for Bozan to rely on some of the alleged misrepresentations.  Because Bozan was not an experienced business person and because there is evidence that he took some measures to learn about both the business and the variety of different tanning machines on the market, that ground alone is insufficient to entitle Jovanes to summary judgment.

not comparable.  In fact, one of Jovanes' alleged selling points with Bozan was that his high pressure machines were less expensive than other such machines.  Bozan Aff. ¶ 12.  A reasonable fact finder could infer from this that Jovanes knowingly misrepresented to Bozan that he was purchasing "high pressure" machines and getting a discount, to convince Bozan to purchase the machines.

Jovanes also contends that Bozan suffered no injury.  A reasonable jury could find otherwise.  Specifically, a jury could find that Bozan would not have invested had he known the truth, making his financial losses in the investment part of his injury.  Bozan's losses connected with the Comerica loans may also form part of his injuries if Comerica would not have approved the loans had it known the true status of Gambino's tanning salon business experience.

**B.     RICO claims**

The RICO statute provides a private cause of action to "[a]ny person injured in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964©.  To prove a civil RICO claim under section 1962©, the plaintiff must show that the defendant engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Goren v. New Vision International, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998); *see also Salinas v. United States*, 522 U.S. 52, 62 (1997).  Bozan also asserts a claim under RICO section 1962(d), which makes it unlawful "for any person to conspire to violate . . .   the provision[ ] of subsection . . .  (c) . . . ."  18 U.S.C. § 1962(d).

In the Seventh Circuit, "a civil RICO plaintiff need not allege or prove injury beyond an injury to business or property resulting from the underlying acts of

racketeering . . . ." *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.*, 747 F.2d 384, 398 (7th Cir. 1984). The Court in *Haroco* "read [the] 'by reason of' language [in the statute], [as] . . . impos[ing] a proximate cause requirement on plaintiffs." *Id.* at 398. Thus, "[t]he criminal conduct in violation of section 1962 must, directly or indirectly, have injured the plaintiff's business or property." *Id.* In *Beck v. Prupis*, 529 U.S. 494 (2000), the Supreme Court concluded "that injury caused by an overt act that is not an act of racketeering . . . under RICO . . . is not sufficient to give rise to a cause of action under § 1962(c) for a violation of § 1962(d)." *Id.* at 505. Thus, to prevail on a claim under section 1962(c) or 1962(d), a plaintiff must prove that a racketeering act caused his injury. *Id.* at 507.

### 1.    Proximate cause

Bozan alleges that Jovanes and Gambino committed bank fraud, mail fraud, and wire fraud in connection with the KGI loan and the KGB loan. *See* Am. Compl. ¶¶ 95-105. The parties focus largely on the KGB loan, so the Court will do the same.

According to Bozan, Gambino and Jovanes misled Comerica to induce it to make the KGB loan and, at the same time, misled him to induce him to, among other things, guarantee the loan and pledge his property as security. *See id.* ¶¶ 100(A)-(K), 101(A)-(G), 102(C) & 103. Bozan also alleges that Jovanes and Gambino violated the bank fraud statute by inducing him to take out the home equity loan from LaSalle Bank, the proceeds of which he used for the deposit on the tanning machines, and by inducing him to issue a $10,000 check on his account at LaSalle Bank that he used to make another payment to Jovanes in connection with the tanning units. *Id.* ¶ 102(A) &

19

(B).  Bozan further alleges that Jovanes and Gambino violated the mail fraud statute in that the mail was used to send and receive information from Comerica relating to the loan, and wires were used to send information to Comerica and to disburse the loan proceeds.  *Id.* ¶¶ 104-05.

Defendants' alleged actions to induce Bozan to obtain the LaSalle Bank loan and to issue the check do not amount to bank fraud in violation of 18 U.S.C. § 1344. Fraudulently inducing a person to obtain money from a bank is not bank fraud.  *See, e.g., United States v. Jacobs*, 117 F.3d 82, 92-93 (2d Cir. 1997) ("In order for the bank fraud statute to apply, the fraud must be against the bank.").

By contrast, defendants' allegedly fraudulent actions to obtain the Comerica loan were directed at a bank.  Bozan guaranteed that loan and as a result lost money. Jovanes argues that the injury to Bozan resulting from the Comerica is too indirect and remote to be considered to have been proximately caused by bank fraud.  The Court is inclined to agree.  "[T]he bank fraud statute isn't designed to protect [the plaintiff], it is designed to protect banks."  *Bressner v. Ambroziak*, 379 F.3d 478, 482 (7th Cir. 2004). Indirect injuries like the one Bozan claims – he was injured only because the direct victim, Comerica, was unable to collect on the loan from the primary obligor – typically are considered too remote to have been proximately caused by a RICO violation.  *See generally Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268-69 (1992). "The general tendency of the law, in regard to damages at least, is not to go beyond the first step."  *Southern Pacific Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918) (Holmes, J.), *quoted in Holmes*, 503 U.S. at 271.

The Court need not decide that question definitively at this juncture, however, because Bozan *does* claim to be a direct victim of the mail and wire fraud offenses alleged in his complaint. These offenses are claimed to have been part and parcel of a single scheme: to defraud both Comerica and Bozan, in an effort to get both of them to contribute money to the venture (and into the pockets of Gambino and Jovanes) and to shift the risk of loss away from Gambino and Jovanes. There is no issue of indirect injury or lack of proximate causation, as there can be more than one victim of a mail or wire fraud, and the offenses do not involve any element requiring fraud on a financial institution. At least some significant portion of Bozan's alleged losses arose directly from the alleged mail and wire fraud. For this reason, the Court rejects Jovanes' proximate cause argument with regard to both the RICO and RICO conspiracy claims.

### 2. Jovanes' participation

The Court also rejects Jovanes' contention that Bozan lacks evidence from which a reasonable jury could find that he participated in the alleged racketeering activity or that he participated in a conspiracy with Gambino to violate the RICO statute.

With regard to the predicate acts of mail and wire fraud, Jovanes contends that neither he nor his business(es) participated in the process of applying for the Comerica loan. Gambino testified, however, that Jovanes submitted paperwork to the bank in support of the loan application. Gambino 10/27/2008 Dep. 263-64. In addition, Jovanes was a direct beneficiary of the Comerica loan; proceeds from the loan were wired to the Jovanes Asset Management account. And on a more general level, Bozan has offered evidence, discussed earlier, that Jovanes worked together with Gambino to secure Bozan's investment and purchase of the tanning machines, for his own benefit

as well as that of Gambino.  A scheme to defraud Bozan arguably would not have

worked without the Comerica loan, which provided essential financing for the venture.

Though Bozan may not have been directly involved in submitting false information to

Comerica, that is of little consequence given the evidence of his involvement in the

overall alleged scheme.  As the Seventh Circuit has stated,

> "One or more persons can originate and carry out a scheme to defraud
> and any number of persons can operate the plan, each doing his part
> after the machinery is put in motion; and it would be of no consequence
> that each and all did not actively participate in the several acts . . . if each
> were aiding and advising in furtherance of the scheme."

*United States v. Melton*, 689 F.2d 679, 684 (7th Cir. 1982) (quoting *Reuben v. United*

*States*, 86 F.2d 464, 469 (7th Cir. 1936)).

The Court also rejects Jovanes' argument that there is no evidence from which a

jury reasonably could find that he participated in a conspiracy with Gambino to violate

the RICO statute.  To establish such a conspiracy, Bozan must prove that Jovanes "by

his words or actions, objectively manifested an agreement to participate, directly or

indirectly, in the affairs of an enterprise, through the commission of two or more

predicate crimes."  *Roger Whitmore's Auto. Servs., Inc. v. Lake County*, 424 F.3d 659,

674 (7th Cir. 2005).  In this regard, there is no need to rehash the evidence; the issue is

effectively the same as the one the Court addressed in rejecting the parallel argument

Jovanes made in seeking summary judgment on Bozan's civil conspiracy claim.  As is

the case with a claim of civil conspiracy, "direct evidence of [an] agreement [among the

members of a RICO conspiracy] need not be shown[;] an agreement can be inferred

from the circumstances."  *United States v. Stephens*, 46 F.3d 587, 592 (7th Cir. 1995)

(internal quotation marks and citation omitted).  As the Court has discussed, successful

22

completion of the alleged scheme required Bozan's investment in the tanning salon business, as well as the Comerica loan, secured by Bozan's guarantee.

Though it is not entirely clear, Jovanes may also be challenging the sufficiency of the evidence of his participation in the alleged RICO enterprise. To be liable under section 1962(d), a defendant "does not need to agree personally to be an operator of manager" of the enterprise. *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000). Rather, what is required is that the defendant "knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner. It is an agreement, not to operate or manage the enterprise, but personally to facilitate the activities of those who do." *Id.* There is evidence sufficient for a reasonable jury to find that Jovanes did not (as he contends) simply sell goods to the enterprise but rather participated in it in a way that facilitated the alleged fraud on Bozan.

**C. Rescission**

"Rescission is an appropriate remedy when there has been . . . fraud in the making of a contract." *Pinelli v. Alpine Dev. Corp.*, 70 Ill. App. 3d 980, 1000, 388 N.E.2d 943, 957 (1979). "Restoration of the *status quo* requires the rescinding party to return any consideration it received from the other party under the contract." *23-25 Bldg. P'ship v. Testa Produce, Inc.*, 381 Ill. App. 3d 751, 757, 886 N.E.2d 1156, 1163 (2008) (emphasis added). The party seeking rescission "is not required to put the other party in the same situation in which he was before the contract, [however,] where the latter has rendered [restoring the *status quo*] impossible by the nature of his fraud . . . ."

*Id.* at 758, 886 N.E.2d at 1164 (*citing Hakala v. Ill. Dodge City Corp.*, 64 Ill. App. 3d 114, 120, 380 N.E.2d 1177, 1181 (1978)); *see also Int'l Ins. Co. v. Sargent & Lundy*, 242 Ill. App. 3d 614, 629, 609 N.E.2d 842, 852-53 (1993).

Bozan contends he is entitled to rescind his contract with Jovanes because Jovanes fraudulently induced him to purchase the tanning machines by misrepresenting their quality and value. To establish this claim, Bozan must prove all the elements of fraud as defined above. *23-25 Bldg. P'ship*, 381 Ill. App. 3d at 758, 886 N.E.2d at 1164. For the reasons explained earlier, there is sufficient evidence for a fact finder reasonably to conclude that the contract was induced by fraud.

Jovanes contends that because Bozan no longer owns the tanning machines, he cannot restore the *status quo*, and as a result rescission is not a proper remedy. If the contract was induced by fraud, however, then Bozan's inability to put Jovanes in the same situation he was before is excused. *23-25 Bldg. P'ship*, 381 Ill. App. 3d at 758, 886 N.E.2d at 1164. A reasonable fact finder could conclude that Jovanes benefitted from the fraudulent contract and that he rendered restoration of the *status quo* impossible by the nature of his fraud. When Gambino defaulted on her loans, the banks auctioned off the tanning machines pursuant to the guaranteed loan agreement. Jovanes purchased all three sets of unused machines at a discounted price and allegedly tried to re-sell the same machines to Bozan. Bozan Aff. ¶ 63.

### D.    Unjust enrichment

Unjust enrichment is an appropriate remedy if "the defendant unjustly retained a benefit to plaintiff's detriment and defendant's retention of the benefit violates

fundamental principles of justice, equity and good conscience." *Stathis v. Geldermann, Inc.*, 295 Ill. App. 3d 844, 864, 692 N.E.2d 798, 811 (1998) (internal quotation marks and citation omitted). In some instances, the plaintiff seeks to recover a benefit "that was transferred to the defendant by a third party. In such situations, . . . retention of the benefit would be unjust where . . . the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, . . . , or the plaintiff . . . ha[s] a better claim to the benefit than the defendant." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp. Inc.*, 131 Ill. 2d 145, 161-62, 545 N.E.2d 672, 679 (1989) (citations omitted).

In this case, Jovanes transferred funds from his Jovanes Asset Management account to his personal account, which is also under Cindi Jovanes' name. Bozan claims that the funds should have been returned to him because Jovanes obtained the money through fraud. Because the money is now in the Jovaneses' personal account, Bozan alleges that Cindi Jovanes has been unjustly enriched. Although there is no evidence that she committed any fraud, "[a] cause of action based on unjust enrichment does not require fault or illegality on the part of the defendant . . . ." *Stathis*, 295 Ill. App. 3d at 864, 692 N.E.2d at 811. If Nicholas Jovanes committed fraud, then Cindi received the benefit of money that rightfully belongs to Bozan, which may amount to unjust enrichment. *See HPI Health Care Servs., Inc.*, 131 Ill. 2d at 161, 545 N.E.2d at 679.

## Conclusion

For the foregoing reasons, the Court denies defendants' motion for summary

judgment [docket no. 118].  The case is set for a status hearing on November 24, 2009

at 9:30 a.m. for the purpose of setting a trial date.

_____

MATTHEW F. KENNELLY
United States District Judge

Date: November 13, 2009